**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**HATTIESBURG DIVISION**

**JEFFREY RUSS**                                                               **PLAINTIFF**

**VERSUS**                                         **CIVIL ACTION NO. 2:11cv195KS-MTP**

**SAFECO INSURANCE COMPANY OF**
**AMERICA, MEMBER OF LIBERTY MUTUAL**
**GROUP; AND DOE DEFENDANTS, INDIVIDUALS**
**AND/OR CORPORATIONS, 1-10**                                    **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

This matter is before the court on a Motion for Summary Judgment **[#6]** filed on

behalf of Safeco Insurance Company of America.  The court, having reviewed the

motion, the response, the pleadings and exhibits on file, the briefs of counsel, the

authorities cited and being otherwise fully advised in the premises finds that the motion

is not well taken and should be denied.  The court finds specifically as follows:

**BACKGROUND**

Safeco Insurance Company of America ("Safeco") issued a policy of insurance to

Jeffrey Russ, bearing policy number OX5802761 with effective dates of January 9,

2011, through January 9, 2012.  This policy was in effect at the time the insured

suffered a fire loss on March 15, 2011 at the covered property which was located at 651

Ovett Moselle Road in Ovett, Mississippi.  Russ reported the fire loss to Safeco on

March 16, 2011, around 9:00 a.m.  That same day, he also reported the loss to Wells

Fargo, the mortgagee, and to all his utility service providers.

Safeco Customer Service told Russ on March 16th the claim was assigned to adjuster Liz Tobler.  When Russ contacted her that day, Tobler conducted a recorded interview with him.  He also emailed pictures of the burned out house to Safeco that day which revealed the property was destroyed and uninhabitable.  Tobler did not ask Russ for an alternate mailing address.  Russ' email of the pictures provided Tobler with his business telephone number and his email address as ways for Safeco to communicate with Russ.

On April 11, 2011, Liz Tobler, mailed correspondence to Russ at the address of the property where the fire occurred, which was the address on the policy (the letter was actually dated April 8, 2011). The letter was returned to Safeco on April 22, 2011.  The adjuster forwarded the letter to Russ by email on that date.  The correspondence dated April 8, 2011 provided Russ with notice of policy provisions, including requirements of an insured after a loss and made requests for some specific information.  This letter also reserved the rights of the company and provided Russ with a blank sworn statement and proof of loss.

Safeco referred Russ' claim to Brightclaim who assigned Casey Newport as the inspector.  Casey Newport visited the property on March, 22, 2011, one week after the fire.  Russ provided Newport with the initial information to begin compiling an inventory of the losses.  He also told Newport about items which had been stolen from the premises since the date of the fire, and these items were recorded on a separate page of the inventory sheet.  Later that day after Newport's visit, Russ emailed Newport a list of clothing and a few additional items which he had identified as being in the house to add to the inventory.

On March 23, 2011, Aaron Larkin, also of Brightclaim, contacted Russ.  He sent Russ a partial inventory of items he and Newport had identified as stolen during Newport's visit for Russ' review.  Larkin informed Russ the fire loss inventory was being data-entered at that time and as soon as entry was finished, he would forward the list to Russ for review after which he said he would "get this closed and back to your adjuster." On March 24, 2011, Larkin emailed Russ the information he had input on the inventory of fire loss items from the house, and asked Russ to review it and get back to him on any corrections or additions, and, when complete, he would send it to the adjuster.

Russ emailed Larkin concerning his review of the stolen property list late on March 24, 2011.  The next day, Larkin replied commenting Russ was getting back to him quickly with the necessary information.  He stated he would get it to the adjuster that day.  On March 26, 2011, Russ emailed Larkin again on the theft claim inventory concerning an item the manufacturer could not replace in the exact configuration stolen. Larkin responded to Russ' question on March 30, 2011 and asked more questions about the theft claim.

On March 30, 2011, Russ emailed Gregory Tolin of Safeco requesting additional living expense funds to cover extra fuel for transporting his son an additional 57 miles to his school until such time as his son could be transferred to a school closer to where they were staying after the fire.  Russ provided the approximate cost per week for the extra miles as well as the number of miles each trip.  Tolin refused to provide any additional living cost funds.  Russ informed Tolin that because of that refusal, he would have to incur the cost of a loan to cover the extra living costs Safeco refused to authorize or pay for at that time.

-3-

According to Russ, around the end of March, about a week after Newport's on-site visit, Safeco sent a fire investigator from Brookhaven to do an on-site investigation. Russ cannot recall his name or the name of his company.  Russ met with him that afternoon and provided him with contact information for his father and his ex-wife along with a rough layout of where furniture was sitting throughout the house.  Russ' former business partner, Chris McCreary, was present at the time and provided his contact information and how he learned of the fire.  The investigator took some notes regarding where furniture and other items were placed throughout the house.  He said he had taken some samples to send to a lab for analysis and asked Russ to walk about the house with him.

Around the same time, Russ received and responded to communications left for him to get in touch with Liberty Mutual's investigator, Brett Bernard, regarding the fire loss.  Bernard made arrangements for Russ to meet him at the property.  When he arrived they walked around and through the house, and then returned to Bernard's vehicle.  Bernard informed Russ he was going to tape an interview at that time.  He produced a laptop computer and small recording device and made statements on the recording regarding the date, time, location, and Russ' consent regarding the recording of the interview.  The taped interview lasted approximately fifty-eight minutes.

Russ did not hear anything else from Bernard until Bernard emailed him on April 5, 2011 requesting copies of all Russ' bank statements, business and personal, for the last six months and a detailed call log for Russ' cell phone for the month of March. Russ contends all of his records and business papers had been in the house and were destroyed by the fire including his banking records, receipts, tax files and old bills.

-4-

Russ replied immediately telling Bernard his fiancé still had all the calls and emails from his ex-wife from the day of the fire on her phone if Bernard was interested in the times of those calls and messages.  That same day, he also faxed to Bernard copies of all the bank records he could access and download online.  He also faxed the paperwork he got from the bank when he opened the account for his new business after the fire.  Russ also checked with the bank on costs and learned obtaining copies of earlier records would cost $1.00 per page.  He provided the cost information to Bernard along with the name of the bank and the account number for his checking account.  He also provided Bernard with online records showing the last four digits of his savings account number, its current balance of $0.77 and the last transaction which was four months before the fire.  He could not remember the rest of the account number.

In addition, Russ provided the cost for obtaining a call log for the cell phone and informed Bernard he could not obtain the call log or banking records for his former business because everything was in he former partner's name, Chris McCreary.  McCreary would have to make the request for the copies.  Russ provided his former partner's name and phone number to Bernard.

Russ emailed Tobler at Safeco on Monday, April 18, 2011, regarding his claims' status and received no response.  On April 20, 2011, he emailed again because he hadn't heard anything on the information he had submitted three weeks earlier.  He told Tobler he needed information on the policy guidelines for advanced living expenses because his extra living expenses were so high he couldn't cover them and the mortgage.  He informed Safeco through Tobler that the mortgage company was foreclosing because he couldn't make the payments and also cover his additional living

expenses.  Tobler responded by email two days later, on April 22, 2011, that his claim was still under investigation.  This is the email in which she attached a copy of the letter mailed to Russ at the fire address on April 8, 2011 from Safeco.  Tobler did not respond to Russ' requests for information about the advance living expenses under the policy.

On May 3, 2011, Tobler, wrote a letter to Russ at his new address reminding him that the proof of loss and supporting documentation had not been received, and reminded him of the deadline for receipt of the proof of loss.  Tobler further advised Russ with regard to the theft loss that Mr. Russ had mentioned, that it would be a separate occurrence.  This letter from Safeco requests that Russ produce certain additional documentation and records to Safeco.

On or about June 3, 2011, Tobler, sent Russ another letter, again reminding him of the requirement to file a proof of loss and the deadline for doing so, as well as other information that had been requested and was being sought from him.  This letter also, for the first time, specifically invoked the right of Safeco to take an examination under oath from Russ, pursuant to the terms of the policy, and notified Russ that Safeco would be hiring counsel who would contact him setting the date, time and location of the examination.

On June 8, 2011, Tobler, received via fax (and later by U.S. mail), correspondence from attorney Mark Howard, who stated he represented Russ.  The letter contained a sworn proof of loss and formally requested Safeco make payment to the mortgage holder as well as pay Russ' claims.  Howard's letter also re-listed all of Safeco's prior requests for information and how Russ had responded to them.  Safeco replied on June 10, 2011 with a letter to Russ stating it was holding his Proof of Loss in

abeyance pending completion of investigation.

On or about June 30, 2011, counsel retained by Safeco to conduct the examination under oath of Russ, Roy Smith, wrote to Howard as the attorney for Russ, concerning the examination under oath, and indicated that the was scheduled for July 20, 2011 at 10:00 a.m. at Howard's office in Waynesboro.

In a July 12, 2011 letter to Howard, Smith requested confirmation of the July 20 examination and informed Howard that he had not received the documents and records he had previously requested.  Howard responded by fax to Smith providing a copy of Russ' proof of loss, a copy of the June 8, 2011 letter explaining all the information and documentation Russ had previously provided to Safeco, the documentation he had previously informed Safeco had been destroyed in the fire, explaining Russ' inability to pay for duplicate copies from third parties because of Safeco's failure to provide any insurance funds, Russ' prior offers to authorize releases to allow Safeco access to all the financial records it had requested at its own cost, and the necessity of Safeco obtaining Russ' former partner's cooperation to obtain the requested cell phone records.

Due to the requests by Russ that Safeco obtain and pay for the records previously requested from him which would have to be obtained from third-parties, it was agreed between Howard and Smith that they would delay the examination under oath until Russ executed the necessary authorizations to permit Safeco to obtain the requested documents and relieve Russ from any financial burden of obtaining the records, and so that documents could be obtained by use of the authorization and be available at the examination under oath.

On July 21, 2011, Smith sent Howard the authorization form for Russ to sign

authorizing access to a much longer and broader list of financial information than previously requested.  Russ met with his attorney and signed the authorization on July 27, 2011.  On August 17, 2011, Russ' attorney wrote Safeco's attorney a letter enclosing the authorization form Russ had signed and the information Russ had provided.  The first paragraph of his letter apologized for delay in returning the form, explaining that he (Howard) had been delayed because of the relocation of his office.

Russ called his attorney on August 24, 2011 to ask about what could be done to get his claim for additional living expenses moving.  On August 25, 2011, Russ' attorney wrote Liz Tobler complaining he had had no response to his requests beginning June 8, 2011 for (a) instructions or guidelines on how to submit additional living expense claims, (b) reasons for denying or delaying payment on all my claims, (c) preserving and providing him with copies of all communications with adjustors and Chris McCreary, (d) providing him with copies of all reports of investigators and all reports of adjusters made to Safeco, and (e) providing a complete copy of Russ' claim file.

Despite not having received instructions on how to file a claim for additional living expenses, Russ' attorney sent Tobler copies of Russ' breakdown of all the additional living expenses for March through June and copies of most of the phone bills, utility bills, and credit card bills documenting many of the claimed expenses.  He informed her if Russ did not receive payment for at least his additional living expense claim within the next seven days, with or without a reservation of rights, Russ intended to file suit as it had already been five months since the fire with no payments of any kind and the delay had already caused substantial damage of which Russ had kept Safeco informed.

Russ states that he became increasingly concerned about getting his attorney to

-8-

act promptly in regard to this case, especially in regard to the additional living expense claim and responding to Russ' communications.  Because of those delays, Russ notified Mark Howard in writing on August 30, 2011 that he was terminating their attorney-client relationship immediately and would pick up his file on September 2, 2011.  When Russ stopped by to pick up his file on September 2, 2011, his attorney was out so he could not get the file.  Russ left a note telling him he needed his file.  On September 14, 2011, Russ again notified his attorney in writing of the termination of their relationship and requesting a date and time when he could pick-up his file.

On or about September 20, 2011, Roy Smith, counsel for Safeco, wrote to Mr. Howard enclosing documents that had been obtained by use of the authorization and requesting dates for the examination under oath of Russ.  On September 22, 2011, Mr. Howard wrote to Mr. Smith advising that he no longer represented Russ, and indicated that he was forwarding the correspondence dated September 20, 2011 from Safeco's attorney on to Russ, and that he advised Russ to have his new attorney contact Mr. Smith immediately.

On September 21, 2011, Russ hired his current attorneys, Ingram  Wilkinson, PLLC, and provided them with a copy of his file.  That same day, Ms. Wilkinson reviewed the file and determined Russ' examination under oath by Mr. Smith had been initially scheduled but then been postponed.  She immediately emailed Mr. Smith about getting the examination scheduled and accomplished.  She also expressed concern about the length of time which had passed without Safeco making any additional living expense payment or any payment on Mr. Russ' Proof of Loss.

Two days later, on September 23, 2011, Ms. Wilkinson received a short email

from Roy Smith via his Blackberry telling her he was out and would call her the following Monday, September 26, 2011 when he returned to the office.  He also asked her if she had the various letters and requests to Mr. Russ' first attorney.  She responded immediately telling Mr. Smith she had several letters and it was her understanding he had already been provided with all the information Russ possessed in regard to his requests.  She asked Smith to phone her when he returned to his office the following week.

Although Mr. Smith had said he would call her on Monday, September 26, 2011, Ms. Wilkinson never received the expected phone call.  Instead, the next day, she received an email sent Monday night outlining the general history of the attempts to set the examination under oath of Russ and requesting dates in October to accomplish the examination.  Mr. Smith's Monday evening message ended with a statement that he was going out of town early in the morning, would be traveling all day, would be back late the following Wednesday evening and had depositions all day Thursday.  He suggested they speak on Thursday as the depositions were in his office.  There was no further correspondence or communication from Mr. Smith about the examination under oath as Ms. Wilkinson had filed suit in this matter on Monday, September 26, 2011 as instructed by her client.

Safeco has now filed for summary judgment on Russ' claims asserting that he has forfeited coverage under his policy because he chose to file suit after refusing to timely submit to an examination under oath.  Safeco contends there is no genuine issue of material fact with respect to any of the issues raised by Safeco's motion for summary judgment, therefore entitling Safeco to summary judgment in its favor and dismissal of

Plaintiff's claims with prejudice.

## **STANDARD OF REVIEW**

The Federal Rules of Civil Procedure, Rule 56(c) authorizes summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FRCP 56(c); and *see Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986).  The existence of a material question of fact is itself a question of law that the district court is bound to consider before granting summary judgment.  *John v. State of La. (Bd. of T. for State C. & U.)*, 757 F.2d 698, 712 (5th Cir. 1985).

A Judge's function at the summary judgment stage is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role.  *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 222 (5th Cir. 1986).  "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment.  The dispute must be genuine, and the facts must be material."  *Id.*  "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law

will preclude summary judgment." *Phillips Oil Company v. OKC Corporation*, 812 F.2d 265, 272 (5th Cir. 1987).  Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, . . . all other contested issues of fact are rendered immaterial.  *See Celotex*, 477 U.S. at 323, 106 S.Ct at 2552."  *Topalian v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir. 1992).  In making its determinations of fact on a motion for summary judgment, the Court must view the evidence submitted by the parties in a light most favorable to the non-moving party.  *McPherson v. Rankin*, 736 F.2d 175, 178 (5th Cir. 1984).

The moving party has the duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on his motion.  *Union Planters Nat. Leasing v. Woods*, 687 F.2d 117 (5th Cir. 1982).  The movant accomplishes this by informing the court of the basis of its motion, and by identifying portions of the record which highlight the absence of genuine factual issues.  *Topalian*, 954 F.2d at 1131.

"Rule 56 contemplates a shifting burden:  the nonmovant is under no obligation to respond unless the movant discharges [its] initial burden of demonstrating [entitlement to summary judgment]."  *John*, 757 F.2d at 708.  "Summary judgment cannot be supported solely on the ground that [plaintiff] failed to respond to defendants' motion for summary judgment," even in light of a Local Rule of the court mandating such for failure to respond to an opposed motion.  *Id.* at 709.

However, once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence.  *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978).  In other words, "the

nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact."  *In Re Municipal Bond Reporting Antitrust Lit.* , 672 F.2d 436, 440 (5th Cir. 1982).  To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial.  Rule 56(e), Fed.R.Civ.P.  *See also, Union Planters Nat. Leasing v. Woods*, 687 F.2d at 119.

While generally "'[t]he burden to discover a genuine issue of fact is not on [the] court,' (*Topalian* 954 F.2d at 1137), 'Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention-the court must consider both before granting a summary judgment.'"  *John*, 757 F.2d at 712 (quoting *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir. 1980)).

## LAW AND ANALYSIS

The Mississippi Supreme Court has been very clear in its decisions regarding examinations under oath and the importance of that right to an insurance company who is presented with a claim by its insured.  *See The Home Insurance Company v. M.T. Olmstead, et al.*, 355 So.2d 310 (Miss. 1978); *Allison v. State Farm Fire & Cas. Co.*, 543 So.2d 661 (Miss. 1989).  The Court has specifically upheld the rights of an insurer to take examinations under oath of their insureds in order to be fully advised as to the facts and circumstances surrounding a loss.  It is the obligation of the insured to promptly submit to an examination under oath when requested and to comply with reasonable

requests for documents.  *See, e.g., Olmstead*, 355 So.2d at 313 (submission to an examination is material to the policy agreement and a refusal by the insured to satisfy this demand works as a forfeiture of his right to recover on the policy); *Allison v. State Farm Fire & Cas. Co.*, 543 So.2d 661 (Miss. 1989); *Archie v. State Farm Fire & Cas. Co.*, 813 F. Supp. 1208 (S.D. Miss. 1992); *USF&G v. Conaway*, 674 F.Supp., 1270 (N.D. Miss. 1987); *USF&G v. Wigginton*, 1991 WL 343375 (S.D. Miss. 1991), No. J91-0209(L), September 12, 1991.

Russ argues he has never refused to sit for an examination under oath, to answer any questions asked by Safeco or any of its representatives, or to provide any information he had to Safeco or any of its investigators or attorneys.  Russ asserts that neither he nor his attorneys had any intent to refuse to comply with the request for an examination under oath when suit was filed.  Russ stresses he asked his new attorneys to file suit promptly because he felt Safeco had completely failed in its obligations under the policy to handle his claims in a reasonably expeditious manner and to pay for things that should have been paid immediately after the first adjuster came to the burned house right after the fire.

Forfeitures of insurance policies are looked upon with disfavor by Mississippi courts.  Forfeiture of insurance policies is so odious in law that they will be enforced only where there is the clearest evidence that forfeiture of the policy was the intention of the parties.  *Soso Trucking, Inc. v. Central Ins. Agency, Inc.*, 236 So. 2d 398, 407 (Miss. 1970); *State Farm Mut. Auto. Ins. Co. v. Lindsey*, 388 So. 2d 1189, 1192-1193 (Miss. 1980).

The burden is on the insurer to establish an affirmative defense relied upon to

work a forfeiture of the insurance contract.  *See Olmstead*, 355 So. 2d at 314.

Furthermore, unless some prejudice is shown by an insured's failure to cooperate with

the insurance carrier in its investigation, such a failure to cooperate does not operate to

forfeit the insured's rights under the policy.  *State Farm Mutual Automobile Insurance*

*Co. v. Commercial Union Insurance Co.*, 394 So. 2d 890, 893 (Miss. 1981).

The court exhaustively went through the facts as alleged by the parties in order

to document the long and winding road through which this case proceeded prior to Russ

filing suit.  While it is true that he filed suit prior to being examined under oath, there is

no support for any argument that he refused to submit to such an examination.  The

record is replete with instances of Russ' full cooperation with Safeco, and by that of his

attorneys.  It is unfortunate that there was such a delay in securing the documents that

Safeco deemed it needed in order to perform the examination under oath, but the

record reveals that the blame for that could be equally shouldered by all concerned.

That being said, summary judgment is not appropriate in this case.

IT IS THEREFORE ORDERED AND ADJUDGED that the Motion for Summary

Judgment **[#6]** filed on behalf of Safeco Insurance Company of America is denied.

SO ORDERED AND ADJUDGED this the 12th day of January, 2012.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE

-15-